**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

GLOBAL TITLE, LLC, d/b/a
GLOBAL TITLE SERVICES,

        Plaintiff,

v.                            Civil Action No. 3:09cv550

ST. PAUL FIRE & MARINE
INSURANCE COMPANY,

        Defendant,

and

FIRST TENNESSEE BANK
NATIONAL ASSOCIATION,

        Intervening Plaintiff.

## REPORT AND RECOMMENDATION

This matter comes before the undersigned Magistrate Judge pursuant to 28 U.S.C.

§ 636(b)(1)(B) for a Report and Recommendation on Plaintiff Global Title, LLC's ("Global

Title"), Defendant St. Paul Fire and Marine Insurance Company's ("St. Paul"), and Intervening

Plaintiff First Tennessee Bank National Association's ("First Tennessee") Cross-Motions for

Summary Judgment. (Docket Nos. 70, 71, 74.) The motions have been fully briefed. On

February 9, 2011, the Court heard oral arguments. This matter is ripe for disposition. The Court

exercises jurisdiction pursuant to 28 U.S.C. §§ 1332.[1] For the following reasons, the undersigned

Magistrate Judge RECOMMENDS that the Court find that First Tennessee's claims, asserted in

---

[1] The amount in controversy exceeds $75,000, and diversity of citizenship exists. 28 U.S.C. § 1332.

the initial lawsuit and in the intervening complaint, do not trigger St. Paul's duty to defend or indemnify Global Title. Accordingly, the undersigned RECOMMENDS that the Court GRANT St. Paul's Motion for Summary Judgment (Docket No. 71) and DENY Global Title's and First Tennessee's Motions for Summary Judgment (Docket Nos. 70, 74).

## I. Factual and Procedural Background

### A.    The Anticipated $2.5 Million Business Transaction

On or about October 1, 2007, First Tennessee, a national banking association, entered into a Mortgage Warehouse Loan and Security Agreement with Financial Mortgage, Inc. ("Financial Mortgage"), a lender. (First Tennessee's Am. Intervening Compl. ("First Tenn. Compl.") ¶¶ 1, 5.) Under this agreement, First Tennessee opened a line of credit for Financial Mortgage to fund residential real property loans. (First Tenn. Compl. ¶ 5.) Global Title, a limited liability company, served as the title and closing agent. (First Tenn. Compl. ¶ 6.) "As agent, Global Title would receive funds from First Tennessee prior to the closing of the Financial Mortgage-originated loans. Global Title was to hold the funds in trust and then distribute the funds as directed upon closing." (First Tenn. Compl. ¶ 6.)

On September 11, 2007, First Tennessee, which anticipated funding two Financial Mortgage-originated loans, transferred $1,969,771.74 to Global Title. (First Tenn. Compl. ¶ 7.) On September 28, 2007, First Tennessee transferred another $579,919.79 to Global Title in anticipation of funding yet another Financial Mortgage-originated loan. (First Tenn. Compl. ¶ 7.) Subsequently, Financial Mortgage's President informed Priya Aurora, Global Title's President, that these three anticipated loans would not close. (First Tenn. Compl. ¶ 8.) "Instead of returning the advanced funds to First Tennessee upon finding out that the loans were not going to

2

close, however, Global Title transferred the funds, totaling $2,549,691.53, to Financial

Mortgage." (First Tenn. Compl. ¶ 8.) First Tennessee has been unable to recover the funds from

Financial Mortgage. (First Tenn. Compl. ¶ 8.)

**B.     The Insurance Policy**

Effective June 4, 2008 through June 4, 2009, St. Paul issued Global Title a Professional

Liability Policy ("Policy") with a retroactive date of June 4, 2004. (*See* 2nd White Aff. Ex. 1

("Policy") at SP00005.) (Docket No. 73.) Under the Policy, St. Paul agreed to provide coverage

for real estate professional services, including services as title agent, closing agent, or escrow

agent, so long as such services were performed by protected persons.[2] (Policy at SP00016,

SP00021.) The Policy clarifies:

> We'll pay amounts any protected person is legally required to pay as damages for
> covered loss that:
> *   results from the performance of, or failure to perform, real estate professional
>     services by you or on your behalf; and
> *   is caused by a wrongful act committed on or after any retroactive date that
>     applies and before the ending date of this agreement.
> But only if such covered loss results in a claim or suit first made or brought against
> a protected person while this agreement is in effect and reported to us as soon as
> possible . . . .

(Policy at SP00021.) A "wrongful act" is defined as a "negligent act, error, or omission" or a

"personal injury offense." (Policy at SP00022.) Once a claim or suit is filed for a covered loss,

the Policy states that St. Paul has a duty to defend any protected person in the claim or suit.

(Policy at SP00022.) The Policy also includes various exclusions of coverage, including the

"Handling of funds" exclusion. This exclusion provides:

---

[2] If the insured is a limited liability company, such as Global Title, its members and
managers are protected persons for purposes of the Policy. (Policy at SP00025.)

We won't cover loss that results from any of the following:

- Any unauthorized act committed by any protected person that deprives an owner of the use of its funds.
- Any unauthorized use of funds by any protected person.

. . . .

- The failure of any protected person to properly account for funds.

(Policy at SP00028-SP00029.) The Policy does not define the term "unauthorized."

## C.    The Initial Lawsuit

On April 8, 2009, First Tennessee filed a complaint against Global Title asserting four

claims for relief: Count One alleged negligence, Count Two alleged breach of fiduciary duty,

Count Three alleged conspiracy to commit fraud, and Count Four alleged conversion. Compl. at

3-5, *First Tenn. Bank Nat'l Assoc. v. Global Title, LLC*, No. 3:09cv208 (E.D. Va. Apr. 8, 2009).

Specifically, under the negligence claim, First Tennessee alleged that Global Title owed First

Tennessee a duty to protect its funds and that Global Title breached that duty "when it

negligently transferred $2.5 million of First Tennessee's money to Financial Mortgage." *Id.* at 3.

Under the breach of fiduciary duty claim, First Tennessee asserted that Global Title breached the

fiduciary duty to protect First Tennessee when Global Title transferred the $2.5 million to

Financial Mortgage in contravention of First Tennessee's interests. *Id.* at 4.

On April 17, 2009, Global Title notified St. Paul of this lawsuit and filed a formal claim

for coverage under the Policy, requesting St. Paul to defend and indemnify Global Title. (Global

Title Second Am. Third Party Compl. ("Global Title Compl.") ¶ 5.) On April 28, 2009, St. Paul

notified Global Title that it was declining coverage. (Global Title Compl. ¶ 5.) After receiving

this notification, Global Title sought and was granted leave to file a third-party complaint against

St. Paul. The third-party complaint was subsequently ordered severed, resulting in the current lawsuit.

Global Title and First Tennessee eventually entered into a Joint Stipulation of Dismissal, in which First Tennessee's claims against Global Title were dismissed without prejudice.

## D.   The Current Lawsuit

The current lawsuit was initiated on September 2, 2009 when Global Title's third-party complaint was severed and filed separately. Global Title's complaint against St. Paul seeks a declaratory judgment that St. Paul has a duty to defend all claims brought against Global Title by First Tennessee and alleges breach of contract and bad faith in relation to St. Paul's failure to defend. (Global Title Compl. ¶¶ 7-19.)

First Tennessee sought and was granted leave to intervene in the action. First Tennessee filed an intervening complaint against Global Title alleging one count of negligence. (First Tenn. Compl. ¶¶ 10-13.) Specifically, First Tennessee alleges that Global Title owed First Tennessee a duty to protect its funds, that Global Title breached that duty "when it negligently transferred $2.5 million of First Tennessee's money to Financial Mortgage," and that First Tennessee suffered damages as a direct and proximate cause of Global Title's negligent conduct. (First Tenn. Compl. ¶¶ 10-13.)

St. Paul then filed a counterclaim against Global Title and crossclaim against First Tennessee, seeking a declaratory judgment finding that it has no duty to defend or indemnify Global Title in connection with First Tennessee's initial lawsuit or intervening complaint. (St. Paul Third Am. Countercl. & Cross-cl. for Declaratory J. ¶¶ 26-31.)

5

### E. Cross-Motions for Summary Judgment

On November 9, 2010, the Court heard oral arguments on the parties' first cross-motions for summary judgment. During the November 9, 2010 hearing, Global Title and First Tennessee raised new arguments not presented in briefing. Global Title argued inferences drawn from information in the Mortgage Warehouse Loan and Security Agreement, which had not been made a part of the record in this case. Likewise, First Tennessee presented new arguments based on the Supplemental Closing Instructions, which, although attached to First Tennessee's Intervening Complaint, were entirely unaddressed by Global Title or First Tennessee in the briefing before the Court. Given the nature of the new arguments raised, the Court denied without prejudice the parties' first cross-motions for summary judgment and ordered a new briefing schedule. (Docket Nos. 63, 64, 65.) This matter is before the Court on the parties' second cross-motions for summary judgment.

## II. Standard of Review

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. *Celotex*, 477 U.S. at 322-24. These facts must be presented in the form of exhibits and sworn affidavits. Fed. R. Civ. P. 56(c).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995). Where the court is faced with cross motions for summary judgment, as in the instant case, the court must review each motion separately on its own merits. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "Resolution of the instant matter through a grant of summary judgment is 'especially appropriate . . . because the construction of insurance contracts is a legal question well suited for resolution by the court.'" *W. Am. Ins. Co. v. Johns Bros., Inc.*, 435 F. Supp. 2d 511, 513-14 (E.D. Va. 2006) (*quoting Clark v. Metro. Life Ins. Co.*, 369 F. Supp. 2d 770, 774 (E.D. Va. 2005) (alteration in original)).

### III. Analysis

**A.    Applicable Law**

A court exercising diversity jurisdiction applies the substantive law of the forum state. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78-79 (1938). Virginia law controls the issue at bar.[3] An insurer's duty to defend is broader than its duty to indemnify. *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 155 (4th Cir. 2009) (*citing Brenner v. Lawyers Title Ins. Corp.*, 397 S.E.2d 100, 102 (Va. 1990)); *see Morrow Corp. v. Harleysville Mut. Ins. Co.*, 101 F. Supp.

---

[3] Virginia law finds that "'a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured.'" *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635-36 (4th Cir. 2005) (*quoting Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 419 (4th Cir. 2004)); *see Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993) (stating that Virginia law applies "the law of the place where an insurance contract is written and delivered"). The Policy was delivered to Global Title in Virginia, and the parties agree that Virginia law governs.

2d 422, 426-27 (E.D. Va. 2000) (stating that "if there is no duty to defend *ab initio*, there can be no duty to indemnify"). The duty to defend arises when the complaint asserts allegations against the insured, some of which, if proved, would fall within the scope of the policy's coverage. *Bohreer v. Erie Ins. Grp.*, 475 F. Supp. 2d 578, 584 (E.D. Va. 2007); *Am. & Foreign Ins. Co. v. Church Sch. in the Diocese of Va.*, 645 F. Supp. 628, 630 (E.D. Va. 1986). Virginia law relieves the insurer of its duty to defend only if the claims set forth in the complaint against the insured clearly allege harm not covered under the policy. *Am. & Foreign Ins. Co.*, 645 F. Supp. at 631. "If coverage is in doubt, the insurance company must defend." *Id.* Importantly, "the burden rests on the insurer to establish the clear applicability of a particular exclusion from coverage." *Fuisz v. Selective Ins. Co. of Am.*, 61 F.3d 238, 242 (4th Cir. 1995) (*citing Johnson v. Ins. Co. of N. Am.*, 350 S.E.2d 616, 618 (1986)); *see Transcon. Ins. Co. v. Caliber One Indem. Co.*, 367 F. Supp. 2d 994, 1001 (E.D. Va. 2005).

To determine which allegations in a complaint fall within the scope of an insurance policy's coverage, Virginia courts abide by a combination of the Exclusive Pleading Rule and the Potentiality Rule. *Bohreer*, 475 F. Supp. 2d at 584. The Exclusive Pleading Rule requires that the court determine the insurer's duty to defend "solely by the claims asserted in the pleadings," while the Potentiality Rule mandates that any "potentiality" that the plaintiff's allegations may state a claim covered by the insurance policy triggers the insurer's duty to defend. *Solers, Inc. v. Hartford Cas. Ins. Co.*, 146 F. Supp. 2d 785, 791 (E.D. Va. 2001). This combination of rules ("the Eight Corners Rule") requires the Court "'to compare the four corners of the insurance policy against the four corners of the underlying complaint [to determine] if any allegations may potentially be covered by the policy.'" *CACI Int'l*, 566 F.3d at 153 (*quoting CACI Int'l, Inc. v.*

8

*St. Paul Fire & Marine Ins. Co.*, 567 F. Supp. 2d 824, 829 (E.D. Va. 2008) (alteration in original)). The nature of the insured's conduct trumps the form of the action pleaded, requiring the insurer to defend if any allegations *potentially* state a claim covered by the policy. *Transcon. Ins. Co.*, 367 F. Supp. 2d at 1004 (emphasis added).

### B. First Tennessee's Claims Against Global Title Do Not Trigger St. Paul's Duty to Defend or Indemnify

Application of the Eight Corners Rule to the issue at bar compels this Court to find that First Tennessee did not assert claims potentially covered by the Policy. First Tennessee has filed claims against Global Title alleging negligence, breach of fiduciary duty, conspiracy to commit fraud, and conversion. The parties appear to agree that if St. Paul has a duty to defend, this duty is triggered by First Tennessee's claims for negligence and breach of fiduciary duty.[4] Both First

---

[4] The parties do not contend, nor can this Court find, that First Tennessee's claims alleging conspiracy to commit fraud and conversion trigger St. Paul's duty to defend. Contrary to the position First Tennessee places before this Court, First Tennessee asserted in the initial complaint claims of conspiracy to commit fraud and conversion. As the parties acknowledge throughout briefing, the dispute over the duty to defend continues to stem from the initial First Tennessee complaint, which was dismissed, but without prejudice.

Under the conspiracy to commit fraud claim, First Tennessee alleged that "Global Title and Financial Mortgage conspired to defraud First Tennessee" and that "Global Title intended to wrongfully transfer $2.5 million of First Tennessee's funds to Financial Mortgage." Compl. at 4, *First Tenn. Bank Nat'l Assoc. v. Global Title, LLC*, No. 3:09cv208 (E.D. Va. Apr. 8, 2009). Under the conversion claim, First Tennessee alleged that Global Title intentionally, willfully, maliciously, and illegally converted First Tennessee's funds. *Id.* at 5.

Because the Policy excludes coverage for "loss that results from any criminal, dishonest, or fraudulent wrongful act[s] or any knowing violation of rights or laws," First Tennessee's claims of conspiracy to commit fraud and conversion do not trigger St. Paul's duty to defend. (Policy at SP00028.) However, the Court must still analyze First Tennessee's claims of negligence and breach of fiduciary duty to determine if those allegations trigger St. Paul's duty to defend Global Title. *See Bohreer*, 475 F. Supp. 2d at 584 ("[T]he duty to defend 'arises whenever the complaint [against the insured] alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy.'" (quoting *Va. Elec. & Power Co. v. Northbrook Property & Cas. Ins. Co.*, 475 S.E.2d 264, 265 (Va. 1996)) (second alteration in original)).

9

Tennessee's claims for negligence and breach of fiduciary duty hinge on Global Title's transfer of First Tennessee's funds to Financial Mortgage.

First Tennessee alleges that it transferred over $2.5 million of its funds to Global Title and that "Global Title was to hold the funds in trust and then distribute the funds as directed upon closing." Compl. at 2, *First Tenn. Bank Nat'l Assoc. v. Global Title, LLC*, No. 3:09cv208 (E.D. Va. Apr. 8, 2009); (First Tenn. Compl. ¶ 6.) Instead, Global Title breached its duty to protect First Tennessee's funds by transferring the funds to Financial Mortgage. In analyzing St. Paul's duty to defend, the parties agree that the sole issue, for purposes of summary judgment, is whether the Policy provides coverage for this alleged wrongful act: the transfer of funds to Financial Mortgage.

St. Paul argues that the "Handling of funds" provision excludes coverage for this alleged wrongful act and seeks a declaration that it has no duty to defend or indemnify Global Title against First Tennessee's claims. (St. Paul's Mot. Summ. J. 1, 2 n.1.) Specifically, St. Paul asserts that Global Title's transfer of funds to Financial Mortgage constituted an unauthorized act "that deprives an owner of the use of its funds."[5] (Policy at SP00028; St. Paul's Mem. Supp. 2.)

Global Title and First Tennessee seek a declaration that St. Paul has a duty to defend and indemnify Global Title and argue that the "Handling of funds" exclusion does not apply to the allegations pled by First Tennessee. (Global Title's Mem. Supp. 9-10; First Tenn.'s Mem. Supp. 8.) They do so on several grounds, discussed below.

---

[5] St. Paul also argues that Global Title's transfer of funds to Financial Mortgage constituted an "unauthorized use of funds" and a failure "to properly account for funds." (Policy at SP00028-SP00029.) Because the Court finds the "Handling of funds" provision excludes coverage on other grounds, the Court need not address these arguments.

For the reasons stated below, after comparing the Policy and the allegations of First Tennessee's claims, the Court finds that First Tennessee's claims do not trigger St. Paul's duty to defend Global Title. The plain meaning of the policy language compels this conclusion.[6] Because no duty to defend exists, "there can be no duty to indemnify." *Morrow Corp.*, 101 F. Supp. 2d at 426-27; *see also Bohreer*, 475 F. Supp. 2d at 584 ("If [the insurance company] had no duty to defend [the insured] in the Underlying Action, then it follows that it has no duty to indemnify [the insured].")

1.    **Applying the Policy's Plain Language, the Transfer of Funds Constituted an Unauthorized Act Depriving First Tennessee of the Use of Its Funds**

The Court finds that Global Title's transfer of First Tennessee funds to Financial Mortgage constituted an unauthorized act that deprived First Tennessee of the use of its funds.

Virginia courts interpret insurance policies under the rules of contract interpretation. *KBS, Inc. v. Great Am. Ins. Co. of N.Y.*, No. 3:04cv730, 2006 WL 3538985, at * 6 (E.D. Va. Dec. 7, 2006); *Transcon. Ins. Co.*, 367 F. Supp. 2d at 1001. When a contract fails to define terms of the agreement, courts should "giv[e] words that are not expressly defined their 'usual, ordinary, and popular meaning,' to determine if the plain language of the policy provides the answer." *W. Am. Ins. Co.*, 435 F. Supp. 2d at 516 (quotation omitted); *see Am. & Foreign Ins. Co.*, 645 F. Supp. at 632.

*Black's Law Dictionary* defines the term "unauthorized" to mean "[d]one without authority" or "made without actual, implied, or apparent authority." *Black's Law Dictionary*

---

[6] Where the law of Virginia and the plain language of the policy provide the answer, the Court need not consider the decisions of other jurisdictions. *City of Chesapeake v. States Self-Insurers Risk Retention Grp., Inc.*, 628 S.E.2d 539, 542 (Va. 2006).

1663 (9th ed. 2009). "Authority" is defined as: "The right or permission to act legally on another's behalf; esp., the power of one person to affect another's legal relations by acts done in accordance with the other's manifestations of assent; the power delegated by a principal to an agent . . . ." *Id.* at 152. These definitions make clear that authorization to act on one's behalf requires *that person's* assent.

In the transaction at issue, Global Title acted as the title and closing agent on Financial Mortgage-originated loans. In anticipation of closing three Financial Mortgage-originated loans, First Tennessee transferred over $2.5 million of its funds to Global Title. First Tennessee's claims allege that Global Title had a duty to "hold the funds in trust and then distribute the funds *as directed upon closing.*" Compl. at 2, *First Tenn. Bank Nat'l Assoc. v. Global Title, LLC,* No. 3:09cv208 (E.D. Va. Apr. 8, 2009); (First Tenn. Compl. ¶ 6.) First Tennessee specifically alleges that it was the owner of the funds. Compl. at 3, *First Tenn. Bank Nat'l Assoc. v. Global Title, LLC,* No. 3:09cv208 (E.D. Va. Apr. 8, 2009) (alleging that Global Title breached its duty owed to First Tennessee "when it negligently transferred $2.5 million of *First Tennessee's money* to Financial Mortgage" (emphasis added)); *(see also* First Tenn. Compl. ¶ 12.)

It is undisputed that these three Financial Mortgage-originated loans never closed, and it is undisputed that First Tennessee never directed Global Title to transfer the funds to Financial Mortgage despite the failure to close. Thus, Global Title's transfer of First Tennessee's funds to Financial Mortgage constituted an unauthorized act that deprived the owner of the use of its funds. Accordingly, the "Handling of funds" provision excludes coverage for this unauthorized act. The undersigned thus RECOMMENDS that the Court GRANT St. Paul's Motion for

Summary Judgment and DENY Global Title's and First Tennessee's Motions for Summary Judgment.

**C.     The Attempts By Global Title and First Tennessee to Suggest Ambiguities or Invoke Documents Extrinsic to the Complaint Fail to Contravene the Plain Language in the Policy**

In urging the Court to find otherwise, Global Title and First Tennessee encourage the Court to find ambiguities in the policy, or to look to extrinsic documents to find an ambiguity in the "Handling of funds" provision. The Court turns to these arguments now that the briefs address the arguments made in the parties' second cross-motions for summary judgment.[7]

### 1.     Applicable Law as to Ambiguities in Policies

First, the Court will address the governing law. If the Court deemed a provision of the Policy to be ambiguous, the Court would construe the ambiguous term to afford coverage to Global Title. *See Tiger Fibers, LLC v. Aspen Specialty Ins. Co.*, 594 F. Supp. 2d 630, 639 (E.D. Va. 2009); *Transcon. Ins. Co.*, 367 F. Supp. 2d at 1001; *see also Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 975 (E.D. Va. 2005) (construing terms in an ERISA action). Contract language contains ambiguities when it reasonably may be interpreted in more ways than one. *Firemen's Ins. Co. of Wash., D.C. v. Kline & Son Cement Repair, Inc.*, 474 F. Supp. 2d 779, 788-89 (E.D. Va. 2007) (applying Virginia law); *Solers*, 146 F. Supp. 2d at 792 ("A term is ambiguous if, to a reasonably prudent person, the term is susceptible of more than one meaning."). "As with other contracts, when interpreting a policy courts must not strain to find

---

[7] Global Title and First Tennessee failed to present any arguments based on extrinsic documents in their first round of briefing, and first raised these arguments during the oral argument on the first cross-motions for summary judgment. The Court therefore denied the first motions for summary judgment and ordered a new briefing schedule.

ambiguities." *Res. Bankshares Corp.*, 407 F.3d at 636 (*citing Salzi v. Va. Farm Bureau Mut. Ins. Co.*, 556 S.E.2d 758, 760 (Va. 2002)). Certainly, a term does not create ambiguity merely because the parties disagree as to its meaning or because courts have reached differing conclusions as to its meaning. *Solers*, 146 F. Supp. 2d at 792. However, "[w]here two constructions are equally possible [in the view of a reasonably prudent person], that most favorable to the insured will be adopted." *St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co., Inc.*, 316 S.E.2d 734, 736 (Va. 1984); *see also Tiger Fibers*, 594 F. Supp. 2d at 639 (noting that this rule of construction arises "out of the fact that insurance policies are drafted by insurance companies for the principal purpose of protecting the insured").

### 2. The "Handling of Funds" Provision Unambiguously Excludes Coverage for Unauthorized Acts, Whether Intentional or Negligent

In an effort to establish their first type of ambiguity, Global Title and First Tennessee repeat a mantra that the duty to defend exists because Global Title had authority to transfer funds under the governing documents, but mistakenly did so, either to the wrong party or in the wrong fashion. Global Title and First Tennessee argue that the "Handling of funds" provision is ambiguous in that it is unclear whether the provision excludes coverage for both intentional and *negligent* unauthorized acts. Global Title and First Tennessee essentially contend that Global Title is a victim of Financial Mortgage's criminal conduct and that it is unfair to interpret the "Handling of funds" provision to exclude coverage for Global Title's mistaken unauthorized act. However, applying well-settled principles of contract interpretation, this Court cannot reasonably construe the "Handling of funds" provision to exclude coverage only for intentional acts.

14

Under Virginia law, "courts must not strain to find ambiguities or examine certain

specific words or provisions in a vacuum, apart from the policy as a whole." *Res. Bankshares*

*Corp.*, 407 F.3d at 636 (internal citations omitted). Here, the Policy contains numerous

exclusions situated near in place to the "Handling of funds" exclusion at issue. Several of the

other exclusions specifically preclude coverage for intentional conduct:

> Breach of title agent authority. We won't cover loss that results from any *intentional*
> breach, or exceeding of authority, by any protected person in the capacity of title
> agent.
> . . . .
> Criminal, dishonest, or fraudulent wrongful acts or knowing violations of rights or
> laws. We won't cover loss that results from any criminal, dishonest, or fraudulent
> wrongful act or any *knowing* violation of rights or laws committed by:
> - any protected person; or
> - anyone with the consent or knowledge of any protected person.

(Policy at SP00028 (emphasis added).) Given the language used in other exclusions that

specifically limits the exclusion to intentional conduct, the Court cannot find that the "Handling

of funds" provision applies only to intentional conduct. Indeed, rather than stating it applies only

to intentional conduct, the "Handling of funds" provision excludes coverage for "*[a]ny*

unauthorized act committed by any protected person that deprives an owner of the use of its

funds." (Policy at SP00028 (emphasis added).)

Aside from this Court's earlier analysis where it found no ambiguity generally, reviewing

the Policy as a whole, the Court finds that the "Handling of funds" provision unambiguously

precludes coverage for *any* unauthorized act, whether negligent or intentional, that deprives an

owner of the use of its funds. While the Court recognizes that Global Title appears to be a victim

of Financial Mortgage's alleged criminal conduct, the Court cannot find anything other than that

the Policy excludes coverage for this type of mishandling of funds, even if unintentional, when it deprives an owner of the use of its funds.

3. **The Term "Unauthorized" Is Not Ambiguous Despite Global Title and First Tennessee's Claim that "Authority" to Transfer Can Be Given in Differing Ways**

Global Title and First Tennessee next argue that the term "unauthorized" as used in the "Handling of funds" provision is ambiguous, but the parties approach this argument in different ways. They suggest this failure to define should be construed toward coverage.[8]

a. **First Tennessee's Argument**

First Tennessee contends initially that it is unclear who can provide the requisite authority under the "Handling of funds" exclusion because the policy does not specify what "unauthorized" means. In briefing, First Tennessee suggests that the authorization can come from a broad range of sources, including, in this case, Financial Mortgage. Financial Mortgage was never the owner of the funds, and no allegations before the Court suggest that First Tennessee authorized Financial Mortgage to direct the transfer or use of First Tennessee's funds on its behalf. First Tennessee does not point to an aspect of the policy that would support such an argument, it merely contends that the ambiguity should be construed in its favor. As noted before, this argument does not persuade the Court. Authority stems from ownership, or direction from the owner to act. It would defy common sense to interpret the "Handling of funds" provision to allow someone in Financial Mortgage's position to provide authorization to transfer or use another's funds. That Financial Mortgage made such a request in furtherance of what

---

[8] Obviously, this Court has found that only the owner of the funds can authorize a use of such funds or an act in relation to such funds. As noted earlier, the Court addresses these additional arguments because the procedural history of this case warrants doing so.

appears to be misuse of the funds highlights why "authority" cannot be read in a fashion other than the Court's earlier finding, which certainly precludes the reading First Tennessee urges here.

### b.   Global Title's Argument

Global Title, on the other hand, contends that, because it mistakenly thought that approval from Financial Mortgage gave it authority to transfer, then the duty to defend, and therefore coverage, should ensue. Global Title, relying on the affidavit attached to Global Title's first motion for summary judgment (Docket No. 45, Ex. 7, Priya Aurora Aff.), argues that Financial Mortgage authorized Global Title to transfer the unused funds to Financial Mortgage.[9] (Global Title's Mem. Supp. 10-11; Global Title's Resp. Opp'n 3.) Because Global Title received authorization from Financial Mortgage, Global Title asserts that the transfer cannot constitute an unauthorized act under the "Handling of funds" exclusion. Essentially, Global Title says that because Global Title subjectively, or negligently, thought that it had authority to transfer the funds, the duty to defend should exist. For the reasons enumerated immediately above, the Court cannot apply this subjective definition of authorization as a reasonable construction of the "Handling of funds" provision even were it to consider the affidavit from Aurora.

### 4.   The Court Cannot Review Extrinsic Documents as Part of its Eight Corners Analysis, and the Documents Before the Court Would Not Trigger the Duty to Defend if it Could

Global Title and First Tennessee next attempt to use extrinsic documents to establish that the duty to defend exists. Both Global Title and First Tennessee place documents before the

---

[9] As explained below, the Court finds that Global Title cannot properly place this affidavit before the Court for consideration. *See* Part III.C.4. The Court mentions any extrinsic documents solely in an effort to address all issues raised during the final round of briefing.

Court that, they say, create coverage for Global Title's negligent conduct. The Court must first address whether Virginia's Eight Corners Rule permits it to review these documents.

The United States Court of Appeals for the Fourth Circuit has held that the application of the Eight Corners Rule requires the Court to consider only the underlying complaint itself, and to decline to look at any documents attached to the complaint or on which the complaint relies. *CACI Int'l*, 566 F.3d at 156 (noting that "Virginia courts have not signaled a readiness to look beyond the underlying complaint" in applying the Eight Corners Rule). While Global Title cites no authority for looking beyond the complaint, First Tennessee argues that a recent Supreme Court of Virginia case, *Copp v. Nationwide Mut. Ins. Co.*, 692 S.E.2d 220 (Va. 2010), indicates a readiness to look beyond the complaint. (First Tenn.'s Mem. Supp. 11 n.3; First Tenn.'s Reply 5.)

As discussed below, the Court finds the *Copp* case to be factually distinguishable and declines to expand the reasoning in *Copp* to the case at hand. Regardless, even were the Court inclined to look to documents beyond the complaint and the insurance policy, the Court would still find that St. Paul has no duty to defend Global Title against First Tennessee's claims.

### a. The *Copp* Case Does Not Allow Reliance on the Extrinsic Documents Here

In *Copp*, the plaintiff sought a declaration that his insurance company had a duty to defend in a tort action brought against him. *Copp*, 692 S.E.2d at 221. The tort action sought compensatory damages for assault and battery and alleged "willful, intentional, unjustified, and malicious conduct on the part of [the plaintiff]." *Id.* at 223. While both the primary and umbrella insurance policies excluded coverage for damage resulting from intentional acts, the

18

umbrella policy exclusion contained a self-defense exception, under which damage caused by a covered person trying to protect his person or property would not be excluded. *Id.* at 222-23. Although the complaint, which alleged intentional and unjustified conduct, did not appear to trigger the duty to defend, the Supreme Court of Virginia, after considering testimony from the plaintiff suggesting that he acted in self-defense, found that the insurance company had a duty to defend under the umbrella–but not the primary–insurance policy. *Id.* at 224-26. The Supreme Court of Virginia explained:

> In several prior decisions in this type of case, we have applied the rule that only the allegations in the complaint and the provisions of the insurance policy are to be considered in deciding whether there is a duty on the part of the insurer to defend . . . the insured.
> None of our prior decisions, however, has involved the type of situation we have here, where in one of the four corners of an insurance policy there is a provision specifically stating that an exclusion "does not apply to bodily injury or property damage caused by an insured trying to protect person or property."

*Id.* at 224-25 (internal citations and footnote omitted).

Thus, the *Copp* court indicated a willingness to look beyond the complaint only in cases where the exclusions have exceptions in the same policy that might bring the insured back into coverage. As counsel for Global Title conceded during oral argument, no such exception to the exclusion can be found in the policy at bar. The Court will not rely upon any of the extrinsic documents here.

Regardless, even were this Court to consider documents extrinsic to the complaint, the extrinsic documents cited by Global Title and First Tennessee would not alter the Court's finding that St. Paul has no duty to defend Global Title against First Tennessee's claims.

### b. The Mortgage Warehouse Loan and Security Agreement Does Not Suggest that an Authorized Transfer Occurred

First, Global Title suggests that Financial Mortgage provided viable authority to transfer because, under a separate agreement, it "owned" the funds. Relying on the Mortgage Warehouse Loan and Security Agreement without pointing to any subpart of that document (Global Title's Mem. Supp. Ex. 1 ("Mortgage Warehouse Loan and Security Agreement")), Global Title argues that Financial Mortgage "owned the funds subject to its contractual obligation to repay [First Tennessee]" (Global Title's Mem. Supp. 10). Even if this Court could consider this document,[10] it would show that Global Title is merely a borrower of First Tennessee's funds and may only use the funds as directed and assented to by First Tennessee, the owner of the funds. Defining Financial Mortgage specifically as the "borrower," this agreement states:

> Borrower will not request an Advance under the Line of Credit or otherwise use or attempt to use the proceeds of any such Advance other than to fund the origination or acquisition of the specific Eligible Mortgage Loan for which Borrower requests funding under the Line of Credit.

(Mortgage Warehouse Loan and Security Agreement 8.) Under this agreement, because the three anticipated loans failed to close, Financial Mortgage could not be considered the owner of the unused funds and did not have the authority to direct the use or transfer of First Tennessee's funds. Thus, Global Title's transfer to Financial Mortgage could not constitute anything but an

---

[10] Apart from the Eight Corners Rule, an additional reason may exist not to consider this document. The Mortgage Warehouse Loan and Security Agreement has an effective date of October 1, 2007. (Mortgage Warehouse Loan and Security Agreement 1.) First Tennessee alleges that it transferred the money totaling $2.5 million on September 11, 2007 and September 28, 2007. (First Tenn. Compl. ¶ 7.) First Tennessee does not state the date on which Global Title allegedly transferred the $2.5 million to Financial Mortgage. Based on the facts alleged by First Tennessee, it is unclear whether the Mortgage Warehouse Loan and Security Agreement was even effective at the time of Global Title's transfer of funds to Financial Mortgage.

unauthorized act that deprived First Tennessee of the use of its funds even were this Court to rely upon this document in making any findings.

### c. The Supplemental Closing Instructions

Next, First Tennessee cites a document entitled "Supplemental Closing Instructions" to support its argument that Global Title was clearly authorized to return the unused funds, but negligently returned the funds to the improper entity.[11] (First Tenn. Compl. Ex. A, Supplemental Closing Instructions.) Even if this Court could consider this document, it would actually further support this Court's finding that First Tennessee's claims allege an unauthorized act on the part of Global Title. The Supplemental Closing Instructions provide:

> First Tennessee Bank (the "Bank"), is the warehouse lender in this transaction. The Bank will have a first priority security interest in the Mortgage Loan. If the Mortgage Loan does not close, you are to either 1) return the unused cashier's check to Financial Mortgage, Inc., or 2) return the funds via wire transfer directly to the Bank.

(First Tenn. Compl. Ex. A, Supplemental Closing Instructions.) Because this document further shows that First Tennessee transferred the funds to Global Title via wire transfer and not via cashier's check, Global Title's act in transferring the unused funds to Financial Mortgage was clearly unauthorized even taking into account the Supplemental Closing Instructions.

Thus, even were this Court to consider documents extrinsic to the complaint and the insurance policy, the Court would find that Global Title's transfer of First Tennessee's funds to Financial Mortgage constituted an unauthorized act that deprived the owner of the use of its funds. Accordingly, the "Handling of funds" provision excludes coverage for this unauthorized

---

[11] Apparently thinking these instructions run contrary to its claim that Financial Mortgage "owned" the funds, in the "Introduction" to its brief, Global Title raises a factual challenge to having seen these instructions pre-closing. This argument is of no moment. Global Title cannot raise this evidentiary issue in this improper manner, and it would gain little by doing so. Most importantly, the Court does not weigh the document in its decision at all.

21

act. Further, the Court finds that the "Handling of funds" provision and the term "unauthorized" as used in the "Handling of funds" provision are unambiguous and cannot be *reasonably* interpreted in more than one way.[12] The "Handling of funds" provision in this Policy unambiguously precludes coverage in this case.

## IV. Conclusion

For the foregoing reasons, the undersigned Magistrate Judge RECOMMENDS that the Court find that First Tennessee's claims against Global Title, asserted in the initial complaint and

---

[12] Citing *Transcontinental Insurance Co. v. Caliber One Indemnity Co.*, 367 F. Supp. 2d 994 (E.D. Va. 2005), Global Title and First Tennessee also argue that if the Court interprets the "Handling of funds" provision as St. Paul suggests, the effect would be to eviscerate all coverage for Global Title when acting as an escrow agent. Because the Court finds the term "unauthorized" to be unambiguous, the Court need not reach this argument to the extent that it is based on the doctrine of reasonable expectations. *See Morrow*, 110 F. Supp. 2d at 451-52 (explaining that the doctrine of reasonable expectations applies where insurance contracts are not "drafted plainly and unambiguously").

The Court also notes, however, that interpreting the "Handling of funds" provision as St. Paul suggests would not eviscerate all coverage bargained for by Global Title. The insurance policy at issue in *Transcontinental Insurance* provided coverage for "Fire Suppression System Repair, Installation, and Inspection." *Transcon. Ins. Co.*, 367 F. Supp. 2d at 1007. The court found that if it were to interpret the exclusion at issue as the insurance company suggested, the exclusion would preclude coverage for the repair, installation, and inspection of fire suppression systems. *Id.* The court determined that "some limiting construction of [the exclusion at issue was] necessary to avoid the result that [the insured] in fact purchased no professional liability coverage whatsoever." *Id.*

*Transcontinental Insurance* is factually distinguishable. The Policy at issue in this case provides coverage to Global Title when acting in multiple capacities, including as a title agent, title searcher, abstracter, closing agent, and escrow agent. (Policy at SP0005.) Interpreting the "Handling of funds" provision to exclude coverage for unauthorized acts, whether negligent or intentional, that deprive the owner of the use of its funds does not, as Global Title and First Tennessee suggest, eviscerate all coverage for Global Title when acting as an escrow agent. For instance, the Policy still provides coverage to Global Title when acting as an escrow agent for any personal injury offenses. (*See* Policy at SP00022.) The Policy also defines escrow as "money, property, deeds, or bonds." (Policy at SP00022.) Therefore, the "Handling of funds" provision, which only relates to funds, does not eviscerate all coverage for Global Title when acting as an escrow agent.

in the intervening complaint, do not trigger St. Paul's duty to defend or indemnify Global Title.

Accordingly, the undersigned RECOMMENDS that:

1. The Court GRANT St. Paul's Motion for Summary Judgment. (Docket No. 71.)

2. The Court DENY Global Title's and First Tennessee's Motions for Summary Judgment. (Docket Nos. 70, 74.)

3. The Court DISMISS WITH PREJUDICE Global Title's claim for declaratory relief in its Second Amended Third Party Complaint. (Docket No. 13.)

4. The Court enter a judgment in favor of St. Paul as to all counts in its Third Amended Counterclaim and Crossclaim for Declaratory Judgment. (Docket No. 41.)

The parties are ADVISED that they may file specific written objections to the Report and Recommendation within fourteen (14) days of the date of entry hereof. Each objection should be labeled with the corresponding heading from the Report and Recommendation, should be numbered, and should identify with specificity the legal or factual deficiencies of the Magistrate Judge's findings. Failure to file specific objections to the Report and Recommendation in a timely manner may result in the entry of an Order dismissing the complaint. See Fed. R. Civ. P. 72(b). It may also preclude further review or appeal from such order. *See Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).

Let the Clerk send copies of this Report and Recommendation to counsel of record and the Honorable Richard L. Williams.

It is so ORDERED.

/s/ _____
M. Hannah Lauck
United States Magistrate Judge

Richmond, Virginia
Date: 2/18/11

23